❐ Original        ❐ Duplicate



CLERK'S OFFICE
A TRUE COPY
Apr 24, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Four Apple iPhones (Subject Devices) located at North Central HIDTA, further described in Attachment A | ) ) ) ) |

Case No.  25-M-396 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:        Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 8, 2025 _____ *(not to exceed 14 days)*
❐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Stephen C. Dries _____ .
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❐ for _____ days *(not to exceed 30)*    ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    04/24/2025 10:11 am

*Judge's signature*

City and state:    Milwaukee, Wisconsin            Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.:<br>25-M-396 (SCD) | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

The properties to be searched are described as:

a. a white/gold iPhone with a cracked back, identified as "**SUBJECT TELEPHONE 1**,"

b. a pink/gold iPhone, identified as "**SUBJECT TELEPHONE 2**,"

c. a white/gold iPhone in a pink case, identified as "**SUBJECT TELEPHONE 3**," and

d. a black iPhone, identified as **"SUBJECT TELEPHONE 4**."

**SUBJECT TELEPHONES 1, 2, 3, and 4,** collectively the **"SUBJECT DEVICES"** are currently located at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin. This warrant authorizes the forensic examination of the **SUBJECT DEVICES** for the purpose of identifying the electronically stored information described in Attachment B.

43

## <u>ATTACHMENT B</u>

1.      All records on the **SUBJECT DEVICES,** as described in Attachment A, that relate to Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A); Conspiracy to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846; Possession of a Firearm in Furtherance of Drug Trafficking and Possession of a Machine Gun in Furtherance of Drug Trafficking, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii); and Possession of a Machine Gun, in violation of Title 18, United States Code, Sections 922(o) and 924(a)(2) and involve Timothy BEA and/or Crystal ROBINSON since January 2022, including, but not limited to:

   a.  Contact lists;

   b.  lists of customers and related identifying information;

   c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   d.  any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

   e.  any information recording schedule or travel;

   f.  all bank records, checks, credit card bills, account information, and other financial records;

g. Photographs and/or video depicting possession of drugs, firearms, assets, or other activities related to drug trafficking

h. Any evidence related to either the ownership, purchase, or possession of drugs or firearms;

i. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

j. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **SUBJECT DEVICES**;

2. Evidence of user attribution showing who used or owned the **SUBJECT DEVICES** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.



CLERK'S OFFICE
A TRUE COPY
Apr 24, 2025
/s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Four Apple iPhones (Subject Devices) located at North Central HIDTA, further described in Attachment A | ) ) ) |

Case No. 25-M-396 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 841(b) (1)(A) & 846; 18 U.S.C. §§ 924 (c) and 922(o) and 924(a)(2) | Possession with Intent to Distribute Controlled Substances; Conspiracy to Distribute Controlled Substances; Possession of a Firearm in Furtherance of Drug Trafficking; Possession of a Machine Gun in Furtherance of Drug Trafficking; Possession of a Machine Gun |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SEAN MAYERBOCK (Affiliate)    Digitally signed by SEAN MAYERBOCK (Affiliate) Date: 2025.04.23 17:09:49 -05'00'

*Applicant's signature*

Sean Mayerbock, DEA TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: __4-24-25__

*Judge's signature*

City and state: __Milwaukee, Wisconsin__

Stephen C. Dries, U.S. Magistate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR SEARCH WARRANT

I, Sean Mayerbock, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—four electronic devices—which are currently in law enforcement's possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Detective with the City of Brookfield Police Department and have been a sworn law enforcement officer for over 8 years. I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Drug Gang Task Force. HIDTA is composed of law enforcement officers from the Milwaukee Police Department (MPD), Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), and several other federal and local law enforcement agencies. Since November 2019, I have been a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses. As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of

1

numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency, and other evidence of criminal activity.

3. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses that specialized in the investigation of narcotics trafficking. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other case agents and witnesses. This

affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Throughout this affidavit, reference will be made to case agents or officers. Case agents or officers are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

6.     I am currently investigating Timothy BEA and others for various federal drug and firearms-related offenses including Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A); Conspiracy to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846; Possession of a Firearm in Furtherance of Drug Trafficking and Possession of a Machine Gun in Furtherance of Drug Trafficking, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii); and Possession of a Machine Gun, in violation of Title 18, United States Code, Sections 922(o) and 924(a)(2)(Target Offenses).

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

7.     The properties to be searched are described as a white/gold iPhone with a cracked back, hereinafter identified as "**SUBJECT TELEPHONE 1**," a pink/gold iPhone, hereinafter identified as "**SUBJECT TELEPHONE 2**," a white/gold iPhone in a pink case, hereinafter identified as "**SUBJECT TELEPHONE 3**," and a black iPhone, hereinafter identified as **"SUBJECT TELEPHONE 4." SUBJECT TELEPHONES 1, 2, 3,** and **4,** collectively, the **SUBJECT DEVICES,** are currently located at North Central HIDTA,

3

11548 West Theo Trecker Way, West Allis, Wisconsin. The applied-for warrant would authorize the forensic examination of the **SUBJECT DEVICES** for the purpose of identifying electronically stored data particularly described in Attachment B.

PROBABLE CAUSE

**A.      Background and Summary of Investigation-**

8.      In August 2023, law enforcement officers in Milwaukee, Wisconsin, initiated an investigation into Timothy BEA, who is believed to be distributing large quantities of controlled substances throughout Milwaukee, Wisconsin, and elsewhere. Through investigation, BEA was identified as the owner and operator of Bar 1000, which is located at 3941 N. Teutonia Avenue, Milwaukee, Wisconsin, SUBJECT PREMISES 1. The investigation has revealed that BEA is obtaining suspected kilogram quantities of narcotics from FOAD ISA (FOAD) and HAMMAD ISA (HAMMAD), both of whom are located in Burbank, Illinois. Evidence reflects that BEA uses SUBJECT PREMISES 1 as a location to conduct a large portion of his narcotics distribution activities. Evidence demonstrates that the ISA DTO's source of supply is Marcelino ARREDONDO-SANCHEZ, who is based in Mexico. During the course of court-authorized wiretap interceptions, numerous calls between FOAD and ARREDONDO-SANCHEZ were intercepted wherein they discussed the DTO's procurement of controlled substances, including cocaine and heroin or fentanyl. Case agents believe the controlled substances are trafficked from Mexico, and arrangements are made for the controlled substances to be transported to Illinois for distribution by the DTO. Evidence reflects that once FOAD and HAMMAD have narcotics ready for distribution, the narcotics are historically driven

4

to Milwaukee, Wisconsin, from Burbank, Illinois, at the direction and control of FOAD and HAMMAD. When drug shipments arrive in Milwaukee, Wisconsin, BEA quickly distributes the narcotics to metro-Milwaukee area-based customers/high-level DTO distributors. BEA's drug activities decrease in between deliveries from FOAD and HAMMAD.

9.      Additionally, the investigation has further revealed that FOAD and HAMMAD use hidden compartments under the hoods of vehicles within the engine block to transport controlled substances and/or drug proceeds. Investigators identified the use of hidden compartments by FOAD and HAMMAD by using electronic surveillance near SUBJECT PREMISES 1. As further detailed throughout this affidavit, case agents have observed a consistent pattern of FOAD and HAMMAD taking items out of the engine block area or placing items within the engine block area during trips made to SUBJECT PREMISES 1. Case agents have also observed BEA using the engine block area of his and others' vehicles, including a silver Jaguar XJ8 (WI Reg. AUW-1498), to conceal contraband for transportation and to avoid law enforcement detection.

10.      During surveillance operations between approximately mid-September 2023 to the present time, case agents have observed BEA on very regular basis at SUBJECT PREMISES 1, which BEA is believed to own. Through surveillance of SUBJECT PREMISES 1, case agents observed that the bar has multiple exterior surveillance cameras covering every side the bar. Based on training and experience, case agents know that surveillance cameras are often used by narcotics dealers to conduct counter surveillance on any law enforcement activity and to prevent robberies by rival narcotic dealers.

5

Beginning in October 2024, BEA closed operations at Bar 1000. BEA then began taking actions to transition Bar 1000 into a daycare center, later to be identified as ICare Childcare. As of April 2025, ICare Childcare is not yet in operation. For continuity of this affidavit, ICare Childcare will continue to be referred to as Bar 1000. Despite this shift, BEA continues to be consistently observed at SUBJECT PREMISES 1, which has remained BEA's primary location to conduct narcotics trafficking activities.

### B.     Confidential Source Information

### Source of Information (SOI) 1

11.     Beginning on August 24, 2023, a source of information (SOI), herein referred to as SOI 1, made statements against SOI 1's penal interest. SOI 1 has four narcotics related convictions, and one pending felony narcotics and firearm case. SOI 1 is cooperating in exchange for consideration on a pending felony narcotics and firearm case. SOI 1's knowledge is based on SOI 1's personal involvement in narcotics trafficking. Thus far, the information provided by SOI 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, SOI 1's information has been corroborated by documentary evidence, and lawfully obtained device examinations. SOI 1's information has also been corroborated by digital evidence contained on SOI 1's cell phone, such as phone numbers, text messages, and photographs. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe SOI 1 is credible and SOI 1's information is reliable.

12.     On August 5, 2023, a traffic stop was conducted on a white Volkswagen Atlas (WI APT-5373) in the 800 block of E. Pancake Blvd in Liberal, Kansas. The backseat passenger of the vehicle was later identified as a source of information, SOI 1. During the traffic stop, the vehicle was subsequently searched based on probable cause and the odor of marijuana coming from the vehicle. A search of the vehicle revealed sixty pounds of marijuana and three firearms.

13.     SOI 1 later provided statements to law enforcement identifying SOI 1's source of supply in Milwaukee, Wisconsin. SOI 1 identified Kenneth ROBY as SOI 1's cocaine supplier and identified ROBY's source of supply as the owner of Bar 1000 who case agents later identified as BEA. SOI 1 stated SOI 1 had been to Bar 1000 with ROBY and personally met BEA while at Bar 1000. Bar 1000 was later identified as being located at 3941 N. Teutonia Avenue, Milwaukee, Wisconsin, **SUBJECT PREMISES 1**. SOI 1 stated that ROBY would pay BEA $19,000 for a kilogram of cocaine.

### Source of Information (SOI) 2

14.     Beginning in November 2023, a source of information (SOI), herein referred to as SOI 2, began providing information on behalf of a subject who was arrested for Possession with Intent to Deliver Heroin. SOI 2 has no criminal history.  SOI 2 was cooperating in exchange for third-party consideration on a pending felony case. SOI 2's knowledge is based on SOI 2's personal relationship with BEA. Thus far the information provided by SOI 2 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. Within

7

the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe SOI 2 is credible and SOI 2's information reliable.

15. In November 2023, law enforcement conducted an interview of SOI 2. SOI 2 stated SOI 2 has known BEA for several years. SOI 2 met with BEA at Bar 1000, **SUBJECT PREMISES 1**, on several occasions and discussed the prices of cocaine and heroin with him on one occasion. SOI 2 further detailed that SOI 2 discussed prices of narcotics with BEA in the apartment that is located directly above the bar portion of Bar 1000. SOI 2 stated that the residential unit above the bar contains several televisions that stream footage of the surveillance cameras in and around the bar. Case agents know that Bar 1000 is owned by BEA and contains one commercial unit (Bar 1000) on the first floor, and one residential unit on the second floor that is also controlled by BEA.

## Source of Information (SOI) 3

16. A source of information (SOI), herein referred to as SOI 3, began providing information in November of 2023. The information SOI 3 has provided is against SOI 3's penal interest. The information provided by SOI 3 is consistent with evidence obtained elsewhere in this investigation where SOI 3 was not used, and much of SOI 3's information has been corroborated through independent investigation, including law enforcement records, toll records, and other confidential sources. SOI 3 is cooperating for consideration relating to a felony narcotic trafficking case. SOI 3 has four narcotics related convictions, one firearm related conviction, one conviction for resisting, one conviction for fleeing/eluding an officer, and one pending felony narcotics case. Finally, SOI 3 has had an adequate opportunity to directly observe the events discussed and/or has heard

8

conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI 3 is credible and SOI 3's information reliable.

17.     In November 2023, SOI 3 provided information on Dandre COLEMAN (DOB: xx/xx/1982) and Bar 1000. Case agents know that COLEMAN was a close associate of Timothy BEA from Bellwood, Illinois. SOI 3 identified COLEMAN as SOI 3's source of supply for cocaine. SOI 3 stated SOI 3 met COLEMAN in prison and began purchasing cocaine from COLEMAN after communicating over Facebook Messenger in the early months of 2022. During this time, SOI 3 and COLEMAN coordinated a deal for a kilogram of cocaine for approximately $24,000. COLEMAN directed SOI 3 to a bar that SOI 3 identified as Bar 1000. SOI 3 described Bar 1000 as being near Capitol and Melvina in the City of Milwaukee. Case agents knew this is the general area of where **SUBJECT PREMISES 1** is located. SOI 3 stated that Bar 1000 was under a remodel at this time. Case agents know that Bar 1000, formerly named "Gee Gee's," went through a full remodel before re-opening in approximately May of 2023, corroborating the information provided by SOI 3.

18.     SOI 3 stated that SOI 3 was instructed to meet COLEMAN in an alleyway in the back of **SUBJECT PREMISES 1**. SOI 3 was escorted into **SUBJECT PREMISES 1** by COLEMAN and brought to the second-floor area, which SOI 3 described as a living quarter. SOI 3 was introduced to the owner of Bar 1000. SOI 3 could not remember the bar owner's name but informed case agents that SOI 3 would recognize the bar owner if SOI 3 saw him. SOI 3 received the kilogram of cocaine and stated the cocaine was good

9

quality. In February 2024, SOI 3 viewed a known photograph of Tim BEA and indicated that SOI 3 believed that this photograph depicted the owner of Bar 1000.

19.     SOI 3 stated from that point on, COLEMAN contacted SOI 3 if COLEMAN had a good price on cocaine. Following the first transaction with COLEMAN, SOI 3 stated that SOI 3 started obtaining 4 to 6 kilograms of cocaine per transaction for approximately $22,000 per kilogram. SOI 3 stated the next 3 or 4 transactions between SOI 3 and COLEMAN happened at **SUBJECT PREMISES 1** in the same manner as previously described. SOI 3 stated this changed around the summer of 2022. SOI 3 stated that SOI 3 believed there was some type of disagreement between the bar owner (who case agents believe to be BEA) and COLEMAN about the amount of money each would profit from narcotics deals. COLEMAN began having SOI 3 meet him at a hotel in downtown Milwaukee to conduct their narcotics deals. SOI 3 explained that COLEMAN, or one of COLEMAN's associates, would get a hotel room and tell SOI 3 what room it was.

20.     SOI 3 stated that SOI 3 always paid for the kilograms of cocaine up front and was never "fronted" with the cocaine. SOI 3 stated SOI 3 received a better price on the cocaine by always paying up front. SOI 3 stated the last time SOI 3 dealt with COLEMAN was before SOI 3's arrest in April 2023 when SOI 3 purchased 10 kilograms of cocaine for $19,700 per kilogram. SOI 3 estimated, in total, since the early months of 2022 through April of 2023, SOI 3 received 45-55 kilograms of cocaine through COLEMAN. SOI 3 further explained that SOI 3 believed that COLEMAN was "coat tailing" the owner of Bar 1000 for the narcotics. Because COLEMAN made statements referring to "my brother's bar," SOI 3 believed that COLEMAN was ultimately middling

10

the deals between SOI 3 and the Bar 1000 owner. Additionally, SOI 3 explained on one occurrence, when SOI 3 and COLEMAN were on the phone discussing prices, SOI 3 overheard COLEMAN talking to someone else and asking permission to sell drugs for a certain price. SOI 3 stated SOI 3 assumed it was the owner of Bar 1000 from whom COLEMAN would "get permission."

21.     SOI 3 stated COLEMAN and the owner of Bar 1000 sold both cocaine and fentanyl and had just as much fentanyl as cocaine. SOI 3 stated COLEMAN and the Bar 1000 owner sold kilograms of fentanyl for approximately $45,000. SOI 3 stated SOI 3 received a few ounces of fentanyl from COLEMAN in the past; however, SOI 3 never purchased more because SOI 3 preferred to sell cocaine.

22.     According to SOI 3, SOI 3 knew the narcotics came from the Chicago-land area, based upon conversations SOI 3 had with COLEMAN and SOI 3's knowledge that BEA and COLEMAN are childhood friends from the Chicago-land area.

23.     On July 20, 2023, COLEMAN was charged in Kenosha County Circuit Court with Possession with Intent – Cocaine (>40g) and Obstructing an Officer. *See State of Wisconsin v. Dandre R. Coleman*, Case Number 2023CF001102. COLEMAN was convicted of Felony Possession with Intent – Cocaine (<40g) on April 4, 2024.

**Confidential Source (CS) 1**

24.     Beginning in May 2024, a Confidential Source (CS), herein referred to as CS 1, made statements against CS 1's penal interest. According to law enforcement databases, CS 1 has three narcotics related convictions, and one pending felony narcotics case. CS 1 is cooperating in exchange for consideration on the pending felony narcotics

11

case. CS 1's knowledge is based on CS 1's personal relationship with several members of the DTO. Thus far, the information provided by CS 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. Within the context of information detailed and relied upon for purposes of this Affidavit, case agents believe CS 1 is credible and CS 1's information reliable.

25.     In early 2024, the Waukesha Police Department was conducting a drug investigation in which they conducted five controlled buys of cocaine from an individual who later became a confidential source, CS 1. During the course of these controlled buys, CS 1 sold approximately half an ounce of cocaine in total to a confidential informant.

26.     In May 2024, law enforcement conducted an interview of CS 1. CS 1 identified Bar 1000, **SUBJECT PREMISES 1**, as a location where a large quantity of narcotics was being sold. CS 1 later identified BEA as the owner of Bar 1000.

27.     In June 2024, CS 1 identified Anthony MOORE as a manager at Bar 1000 and close associate of BEA. CS 1 believed that MOORE and BEA were cousins and had grown up together. In June 2024, CS 1 was introduced to BEA through MOORE while at Bar 1000. CS 1 stated that MOORE told CS 1 that he could sell CS 1 a kilogram of cocaine for $20,000.

### C.     DTO Phone Numbers and Court Authorized Interceptions

28.     Throughout this investigation case agents have identified multiple phones used by BEA, FOAD and HAMMAD. For the purposes of this affidavit, the following phones will be labeled as followed for the remainder of this affidavit:

| Phone Number | In Possession of: | Herein Referred to As: |
| --- | --- | --- |
| 630-363-1087 | Timothy BEA | TARGET TELEPHONE 1 |
| 708-986-7822 | Hammad ISA | TARGET TELEPHONE 2 |
| 414-206-8589 | Timothy BEA | TARGET TELEPHONE 3 |
| 312-375-5886 | Foad ISA | TARGET TELEPHONE 4 |
| 312-841-4635 | Foad ISA | TARGET TELEPHONE 5 |
| 414-628-1258 | Timothy BEA | 1258 Phone |
| 414-552-2844 | Timothy BEA | 2844 Phone |
| 262-525-9081 | Timothy BEA | 9081 Phone |
| 708-513-3943 | Foad ISA | 3943 Phone |

29.     In the course of this investigation, the United States District Court for the Eastern District of Wisconsin authorized the following interceptions pursuant to 18 U.S.C. § 2518:

a. On October 16, 2024, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire communications to and from TARGET TELEPHONE 1, used by BEA, and from TARGET TELEPHONE 2, used by HAMMAD. Interceptions were authorized for a period of 30 days.

b. On November 14, 2024, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the continued interception of wire communications to and from TARGET TELEPHONE 2, used by HAMMAD. Judge Stadtmueller also ordered the initial interception of wire and electronic communications to and from TARGET TELEPHONE 3, used by BEA, the initial interception of wire communications to and from TARGET TELEPHONES 4 and 5, used by FOAD. Interceptions were authorized for a period of 30 days.

13

c. On December 13, 2024, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the continued interception of wire communications to and from TARGET TELEPHONE 2, used by HAMMAD, the continued interception of wire and electronic communications to and from TARGET TELEPHONE 3, used by BEA, and the continued interception of wire communications to and from TARGET TELEPHONE 4 and TARGET TELEPHONE 5, used by FOAD. Judge Pepper also ordered the initial interception of wire communications to and from TARGET TELEPHONE 6, used by Larry MONEYHAM. Interceptions were authorized for a period of 30 days.

d. On January 10, 2025, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the continued interception of wire communications to and from TARGET TELEPHONE 2, used by HAMMAD, the continued interception of wire communications to and from TARGET TELEPHONE 3, used by BEA, the continued interception of wire communications to and from TARGET TELEPHONE 4 and TARGET TELEPHONE 5, used by FOAD and the continued interception of wire communications to and from TARGET TELEPHONE 6, used by Larry MONEYHAM. Interceptions were authorized for a period of 30 days.

e. On January 23, 2025, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the renewal of interceptions of electronic communications to and from TARGET TELEPHONE 3, used by BEA. Interceptions were authorized for a period of 30 days.

f. On February 7, 2025, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin entered an order allowing for the continued interception of wire and electronic communications, to and from TARGET TELEPHONE 3, used by BEA, and the continued interception of wire communications to and from TARGET TELEPHONE 4 and TARGET TELEPHONE 5, used by FOAD. Interceptions were authorized for a period of 30 days.

30. Identification of callers, phone numbers, and addresses referenced herein have been established over the course of the investigation through the investigative means discussed above, including many conversations of intercepted communications over several months, phone records, information from confidential sources, public

14

records searches, and electronic and personal surveillance. The intercepted calls detailed within this Affidavit are not exhaustive of all of the call intercepted throughout the monitoring period, and illustrated calls simply provide detail of the relevant and pertinent parts of communications. Furthermore, the significance and meaning attributed to the intercepted communications are based on case agents' training, experience, and knowledge of the investigation.

### Hammad Suspected Narcotics Delivery October 19, 2024 & BEA's Subsequent Distribution

31.     On October 19, 2024, at approximately 2:31 p.m., HAMMAD, using TARGET TELEPHONE 2, called (708) 973-3031, used by his girlfriend, Joanna LOJEK. During the intercepted call, HAMMAD inquired, "You want to come with me somewhere?" LOJEK asked "Where?" HAMMAD stated, "Milwaukee." HAMMAD additionally stated "[U/I] I'll drive. Can you bring your car?" in which LOJEK agreed too. LOJEK asked "Now?" HAMMAD confirmed.

32.     Case agents believe that HAMMAD used LOJEK's vehicle to avoid law enforcement detection. LOJEK's vehicle is registered to her, allowing HAMMAD to conceal his identity by avoiding driving a vehicle registered in his name at his home address while driving to Milwaukee, Wisconsin.

33.     On October 19, 2024, at approximately 2:46 p.m., HAMMAD, using TARGET TELEPHONE 2, called (708) 973-3031, used by LOJEK. HAMMAD asked, "Can you pull my [sic] driveway straight, like facing me? [Voice overlap]" LOJEK confirmed by asking, "Forward" in which HAMMAD responds, "Just regular, yeah." Based on what

15

occurred after this call, as described below, case agents believe that HAMMAD instructed LOJEK to park her vehicle a specific way so he could easily place items within the engine compartment of the vehicle without being seen by bystanders.

34.     Following this phone call, case agents observed via E-911/GPS ping data, that HAMMAD was traveling northbound toward Milwaukee. At approximately 4:52 p.m., case agents observed HAMMAD walk into view of electronic surveillance in the back of SUBJECT PREMISES 1. HAMMAD was carrying a medium sized bag with the straps over his right arm and the bag portion under his right arm. The bag appeared to contain contents within it. HAMMAD walked inside the back gate of SUBJECT PREMISES 1, out of view of case agents. At approximately 4:53 p.m., both HAMMAD and BEA exited the back gate of SUJBECT PREMISES 1. HAMMAD was still carrying the same bag and the two walked over to BEA's Escalade and out of view of electronic surveillance. At approximately 5:06 p.m., HAMMAD was observed saying goodbye to BEA, still holding onto the same bag, and walking back to toward the area that his vehicle was parked, out of view of electronic surveillance.

### BEA's Receipt and Distribution of Narcotics

35.     On October 22, 2024, at approximately 10:20 a.m., BEA, using TARGET TELEPHONE 1, called (262) 887-9040, used by William THOMAS, a suspected DTO distributor. THOMAS answered the phone call and BEA stated, "Uh, I was just checking with you, man." THOMAS responded, "Oh, yeah shit I was gonna give you a call. I was gonna call you yesterday but, shit I gotta … you know? oo a couple more thing and I'll be right at you. My brother said he hollered at you." BEA stated, "Oh yeah, I run into his

ass." THOMAS replied, "Yeah. He had told me and shit. Yeah, I told him, I'll be getting up with him in a little bit though." BEA told THOMAS, "Oh okay, just let me know, boy. [U/I] on the side I was trying to save it for you god damn it." THOMAS replied, "Okay, I got you, don't even trip." The two continued speaking and THOMAS stated, "And that, that right there…Man, they killing that." BEA replied, "Yeah, yeah, that's why I say this one. This order seem like it's a little better." THOMAS replied, "Oh sir [Laughed]," and BEA stated, "Hell yeah. I always trying to get you [U/I] to this motherfucker." THOMAS replied, "Right, well don't even trip, I'm on it though."

36.     Case agents believe that during this call between BEA and THOMAS, BEA was checking in with THOMAS to see if he (THOMAS) wanted more narcotics. BEA told THOMAS that he was keeping some on the side for him. THOMAS told BEA that this specific batch of narcotics was really good in which BEA agreed. Based on the timing of this call (October 22, 2024), which was a few days after HAMMAD met with BEA at SUBJECT PREMISES 1, case agents believe that HAMMAD likely brought a new batch of narcotics and BEA sold a portion of those narcotics to THOMAS.

37.     On October 22, 2024, at approximately 12:34 p.m., BEA, using TARGET TELEPHONE 1, called (414) 737-1183, used by Claudell SIMS, believed to be a DTO distributor. The conversation was already in progress and SIMS stated, "No, by the building." BEA responded, "Oh, you over there?" BEA asked if SIMS was waiting on him. SIMS informed BEA he just pulled up, and BEA responded, "A'ight, you can knock on that back, back door back there. I just told my boy, his name Pumkin. I told him you was about come, gonna let him check it out." BEA followed up by saying, "You ain't got

17

nothing?" In response, SIMS stated "no." BEA told SIMS "Well, you gotta wait then. Shit, I'll be through there [U/I]." The conversation continued with BEA explaining which door and telling SIMS that he should be over there by the time SIMS returns.

38.     Based on the above intercepted call, case agents believed that BEA and SIMS would meet up to conduct a money/drug transaction. In anticipation of this, case agents monitored the court-authorized GPS telephone pings on BEA's telephone. At approximately 12:51 p.m., BEA's telephone was showing to be in the general area of his residence, located at 2636 S. 76th Street; West Allis, WI, SUBJECT PREMISES 2. At approximately 1:00 p.m., BEA's telephone appeared to be north of this location.

39.     Case agents monitored electronic surveillance of SUBJECT PREMISES 1. At approximately 1:09 p.m., case agents observed BEA's black Cadillac Escalade arrive and pull in behind the business. BEA exited the Cadillac and simultaneously, case agents observed two male blacks come into view of electronic surveillance, one being SIMS and another later identified as A.T. BEA, SIMS, and A.T. were observed meeting near the back east facing apartment door of 3947 N. Teutonia Avenue, and appeared to be speaking with an unknown M/B (presumably "Pumkin") who was inside of the apartment unit for approximately 30 seconds. Then BEA, SIMS, and A.T. proceeded to walk over to the back gate of SUBJECT PREMISES 1 and walk into the back gate out of view of electronic surveillance, where SIMS and A.T. stayed until approximately 1:45 p.m.

40.     On October 26, 2024, at approximately 10:05 a.m., BEA, using TARGET TELEPHONE 1, called (414) 248-7180, used by Freddie ROBERTSON, a DTO distributor. ROBERTSON answered and BEA stated, "What's happening, man? Checking with you.

You a'ight?" ROBERTSON responded, "Yeah. Know I-- you know I be--you know what, I be walking my thing down, man. [Laughs]." BEA responded, "You walking all that down huh, man?" ROBERTSON stated, "Yeah, I be working that thing down so... yeah, but you know, shit it's back. You know, I'm coming straight at you soon. Let you know." BEA responded, "Okay, I got you." ROBERTSON stated, "[U/I]. Yeah, I'm coming straight at you, bro. On the real. I ain't fucking around." Both parties acknowledged and the phone call ended.

41.　　Based their training, experience, and familiarity with this investigation, case agents additionally believe BEA was checking in with ROBERTSON to see if he needed any more narcotics, and ROBERTSON informed BEA that he was still selling from the inventory of narcotics he already had; however, when he was out he would come straight to BEA.

42.　　On October 26, 2024, at approximately 10:08 a.m., BEA, using TARGET TELEPHONE 1, called (262) 887-9040, used by THOMAS. THOMAS answered the phone stating, "What's up, fam?" BEA stated, "Not much. Just checking with you, man." THOMAS responded, "Oh yeah, I should be getting up with you today. Man, I been dealing with my daughter with this covid shit." BEA replied, "Aw yeah, that change-- that change in weather shit." THOMAS stated, "Hell yeah. So, I should be getting up with you sometime later on." BEA responded saying, "I got you, bro." THOMAS then replied, "Okay, just have the two aside for me." BEA replied, "I'm trynna keep it, god damnit. [Laughs]" THOMAS later stated, "I got you though, bro. I got you [U/I] things kinda been slow, you know?" BEA responded, "Yeah, I know, man. That's why I been on niggas

19

neck like, 'Man, what's up? Where you at?'" THOMAS stated, "Right. You know what I'm saying?" BEA replied, "It's that time of the year, shit." THOMAS then told BEA, "Yeah, but you know me I'mma make it do what it do. You know what I'm saying?" BEA stated, "It's better to have than not have it. It's better to..." and THOMAS said, "[Voices overlap] Oh hell yeah." THOMAS continued, "Hell yeah. Yeah, but I'll be at you sometime later, though." Both parties acknowledged and the phone call ended."

43. Of note, this phone call occurred three minutes after BEA's outgoing phone call to ROBERTSON that was previously referenced, which further leads agents to believe that BEA was contacting his narcotics customers with the intention of selling them more narcotics. Based on their training, experience, and knowledge of this investigation, case agents believe THOMAS asked BEA to keep "two" kilograms of narcotics aside for him. THOMAS then stated how things have been slow, and BEA acknowledged, explaining that this is why he has been reaching out to his customers. This further evidences BEA's intentions to call his suspected customers, such as SIMS, ROBERTSON, and THOMAS, and pressure them into buying more narcotics. BEA additionally acknowledges that this time of the year is slow for distributing narcotics. BEA also stated that it is better to have narcotics than to not have narcotics, and THOMAS agreed.

44. On October 27, 2024, between approximately 9:58 a.m., and 2:28 p.m., BEA, using TARGET TELEPHONE 1, and SIMS, using (414) 737-1183, exchanged intercepted calls wherein they arranged to meet that day.

45. Following the phone calls exchanged between BEA and SIMS on October 27, 2024, case agents conducted physical surveillance and monitored electronic

20

surveillance at SUBJECT PREMISES 1. Case agents observed that at approximately 3:09 p.m., BEA exited his Escalade. Shortly after BEA exited the vehicle, a male identified as SIMS walked into view of electronic surveillance, toward SUBJECT PREMISES 1. SIMS and BEA left the area in BEA's Cadillac Escalade for approximately 20 minutes before returning back to SUBJECT PREMISES 1. At approximately 5:29 p.m., BEA exited the back gate of SUBJECT PREMISES 1, carrying a white Target plastic grocery bag with contents inside. SIMS and a UM followed behind BEA. SIMS was carrying blue latex gloves. SIMS and the UM walked out of view of electronic surveillance. BEA approached the front passenger door of the Cadillac Escalade and opened it. A few seconds later, BEA closed the door. BEA, still carrying the Target grocery bag, approached the furthest west door of the apartment located at 3947 N. Teutonia Avenue, which is immediately to the north of SUBJECT PREMISES 1. At approximately 5:30 p.m., BEA exited the 3947 N. Teutonia Avenue apartment, no longer carrying the Target grocery bag, and got into the Escalade and left.

46.     Based on case agents training and experience, they know that narcotics dealers often use latex gloves while dealing with narcotics to avoid getting their fingerprints on any packaging material and from having any skin exposure to the narcotics. Additionally, case agents believe that the white Target grocery bag that BEA was holding likely contained packaging material from narcotics. Case agents believe that during the time that SIMS and BEA were in the 3941 N. Teutonia Avenue address, they were indeed dealing with narcotics.

**FOAD Traveled to SUBJECT PREMISES 1 to Retrieve Currency**

47.     On November 20, 2024, at approximately 6:23 p.m., FOAD, using TARGET TELEPHONE 5, called HAMMAD at TARGET TELEPHONE 2. During the call, FOAD stated, "I am in Wisconsin and just got here." HAMMAD responded saying, "Really?" FOAD stated, "I want to go get the money from him to hide it." HAMMAD asked, "How is the drive? Nothing." FOAD responded, "It is very crowded." FOAD and HAMMAD continued to speak about FOAD's trip to Wisconsin before the call ended.

48.     At approximately 6:42 p.m., case agents observed FOAD's black 2024 Ford Edge bearing Illinois registration EA93867 arrive and park in the rear of SUBJECT PREMISES 1. Approximately three minutes later, at 6:45 p.m., BEA arrived in his Cadillac Escalade. BEA parked next to FOAD and exited his vehicle. BEA walked to where FOAD parked his vehicle, which was partially obstructed and not in full view of electronic surveillance. Shortly after BEA walked to FOAD's vehicle, BEA and FOAD walked to the passenger door of BEA's Escalade. BEA opened the passenger door, and FOAD leaned inside. FOAD and BEA then returned to FOAD's vehicle for a short time before returning once again to BEA's open passenger door. FOAD leaned in again before closing the door and returning to his vehicle with BEA. BEA then got into the driver seat of his vehicle and left the area. FOAD also left the area in his vehicle shortly thereafter. Based on the call between FOAD and HAMMAD, and the observation of FOAD and BEA meeting, I believe that FOAD picked up money owed to him from BEA for previously fronted drugs ("I want to go get the money from him to hide it.").

**BEA's Use of SUBJECT PREMISES 2 to Facilitate the DTO**

49. On December 29, 2024, at approximately 1:36 p.m., Hammad ISA, using TARGET TELEPHONE 2, received a phone call from Foad ISA using TARGET TELEPHONE 4. After greeting each other, FOAD asked, "Where are you?" HAMMAD replied, "What is up dad? Dad, I'm calling the numbers, but it's not connecting." FOAD said, "Okay, let me call him right now." HAMMAD stated, "Just tell him I'm by him right now." FOAD asked, "Did you arrive?" HAMMAD responded, "Yes, I arrived," which FOAD acknowledged. Case agents reviewed HAMMAD's E-911/GPS ping location data at approximately 1:52 p.m. and observed that HAMMAD was near SUBJECT PREMISES 1.

50. At approximately 1:40 p.m., BEA, using TARGET TELEPHONE 3, sent a text message to HAMMAD at TARGET TELEPHONE 2 which read, "2656 S 76th." Case agents know this to be the address next-door to BEA's residence. BEA resides at 2636 S. 76th Street, West Allis, Wisconsin. I believe that BEA mistyped the correct address.

51. Case agents conducted electronic and physical surveillance at SUBJECT PREMISES 2. At approximately 1:42 p.m., electronic surveillance (pole camera video of the exterior of SUBJECT PREMISES 2) revealed the overhead garage door opened. At this same time, a red Ford Fusion arrived and parked immediately in front of SUBJECT PREMISES 2. A taller black male exited the driver's seat and retrieved a dark suitcase from the trunk. A black female exited the front passenger seat of the Fusion, then entered the driver's seat. While this was happening, BEA's black Escalade exited the garage of the residence and drove around to the rear of the residence. The overhead garage door closed. The black male from the Fusion wheeled the suitcase to the front door as the

23

Fusion departed the area. A short time later, the black male with the suitcase was allowed entry into the residence.

52. At approximately 1:47 p.m., case agents established physical at SUBJECT PREMISES 2. At approximately 1:55 p.m., FOAD, using TARGET TELEPHONE 4, called HAMMAD at TARGET TELEPHONE 2. FOAD asked, "Did he talk to you?" HAMMAD answered, "Yeah, yeah. I'm going to his mom's house." FOAD acknowledged.

53. At approximately 2:06 p.m., HAMMAD's known silver Lexus arrived at SUBJECT PREMISES 2, and the overhead garage door opened. HAMMAD pulled his Lexus into the garage, at which point the garage door closed. Location data for TARGET TELEPHONE 2 revealed it was in the vicinity of SUBJECT PREMISES 2 at approximately 2:07 p.m. and 2:22 p.m. At approximately 2:25 p.m., the overhead garage door opened, HAMMAD's Lexus exited, and it departed the area.

### Ngada KAMANDA – Drug Customer

54. On December 29, 2024, at 2:38 p.m. BEA, using TARGET TELEPHONE 3, called Ngada KAMANDA, a known drug customer of BEA's, at (414) 467-4928. After exchanging greetings, BEA said, "Shit, I was gonna let you know I got some greens around me man. Probably, come check 'em out whenever you get a chance." KAMANDA asked, "What some za or something?" BEA replied, "Yeah, man, come check 'em out. What you paying for them boys?" KAMANDA answered, "Oh, shit, too much, shit." BEA asked, "You say too much?" KAMANDA confirmed, "Hell, yeah." BEA said, "I'm trying to beat them numbers for you, man." KAMANDA said, "Hell yeah, that motherfucker is too much, shit." After a brief back and forth, BEA said, "Let me

24

know, man. They pretty, they pretty decent ones. They pretty decent ones, though."
KAMANDA responded, "Shit, I'mma, I'mma have to take a look at 'em, shit." BEA said,
"Well, whenever you get a chance." KAMANDA replied, "I will let know."

55.     Case agents know "greens" and "za" are slang terms often used to refer to
marijuana. Therefore, I believe that BEA told KAMANDA that he had marijuana for sale
and wanted KAMANDA to look at the marijuana with the prospect of purchasing some
("I got some greens around me man. Probably, come check 'em out whenever you get a
chance"). In addition, I believe that BEA asked what KAMANDA typically paid for "za"
("What you paying for them boys?"), because BEA was trying to sell marijuana to
KAMANDA for cheaper ("I'm trying to beat them numbers for you, man"). I believe that
BEA advised that the marijuana he had for sale was high-quality, ("They pretty decent
ones, though"), and KAMANDA told BEA he would come look at the marijuana ("I'mma,
I'mma have to take a look at 'em, shit").

56.     On December 29, 2024, at 4:33 p.m., BEA, using TARGET TELEPHONE 3,
called KAMANDA at (414) 467-4928. KAMANDA asked, "Yeah, you said it's uh, it's still
fucked up on the other way?" BEA responded, "Yeah, waiting like a motherfucker."
KAMANDA asked, "You said... what, what's the number on them zaddies [ph]? So I can
uh, tell another motherfucker know or something." BEA answered, "Hell, no; I've been
doing like four-fifty, four-hundred for these cuties and shit." KAMANDA said, "A'ight."
BEA stated, "If they like that I think, you know, a motherfucker come through get a whole
one I might charge them sixteen and a half or something." KAMANDA clarified, "Sixteen

25

and a half?" BEA replied, "Yeah, that's usually what I've been going for this business."

KAMANDA said, "A'ight, shit, a'ight. I'll let you know somethin'."

57.     I believe that in this call, KAMANDA inquired whether BEA still did not have cocaine or heroin available for purchase, ("it's still fucked up on the other way?"), and BEA confirmed he did not, ("Yeah, waiting like a motherfucker"). I believe that KAMANDA then asked how much BEA would charge once he gets the cocaine or heroin so that KAMANDA could tell his customer(s) ("what's the number on them zaddies [ph]? So I can uh, tell another motherfucker know or something"). I believe that BEA advised he charged $400-$450 for an unspecified quantity of cocaine or heroin ("I've been doing like four-fifty, four-hundred"). I believe that BEA noted that if somebody wanted a larger quantity of cocaine or heroin (in context, likely a kilogram), BEA would charge $16,500 for that quantity ("a motherfucker come through get a whole one I might charge them sixteen and a half or something"). I believe that KAMANDA asked to clarify $16,500 ("Sixteen and a half?"), and BEA confirmed.

**Terri LATHON – Drug Customer**

58.     On December 29, 2024, between 2:40 p.m. through 4:29 p.m., BEA, using TARGET TELEPHONE 3, also exchanged text messages with Terri LATHON, another known drug customer of BEA's, at (262) 573-1330. BEA asked, "What you paying," and LATHON replied, "Wht Yu want? Can I jus bring bck it like I was"? BEA texted, "I'll hit you whn I get around thr." LATHON wrote, "Ok, Yu didn't answer the question." BEA answered, "1700." LATHON replied, "Thts must be za." BEA said, "Ima drop sum off n

will go from thr."  LATHON wrote, "Ok thts high … Yu goin to let me bring the money

back?" BEA replied, "Yea."

59.     I believe that BEA knows LATHON has an alternate source of supply of

marijuana and asked how much LATHON was paying ("What you paying").  I believe

that LATHON asked how much BEA was charging and if she could get the marijuana

fronted to her ("Wht Yu want? Can I jus bring bck it like I was").  I believe that BEA

advised he would charge LATHON $1,700 per pound ("1700"), and LATHON indicated

that BEA must have a certain strain of marijuana ("Thts must be za").  I believe that BEA

advised he would drop some off with LATHON to see if she liked it, ("Ima drop sum off

n will go from thr"), and LATHON confirmed whether BEA would let LATHON pay

later, ("Yu goin to let me bring the money back?").  BEA confirmed.  Based on the timing

of these communications, and the earlier observations and interceptions, I believe that

HAMMAD delivered marijuana to SUBJECT PREMISES 2 and, thereafter, BEA reached

out to his customers (LATHON and KAMANDA) to sell said marijuana.

### BEA Owes Drug Debt to FOAD; FOAD Needs ARREDONDONO-SANCHEZ To Supply More Controlled Substances

60.     During the interception period, case agents intercepted calls wherein

FOAD and ARREDONDO-SANCHEZ discussed ARREDONDO-SANCHEZ supplying

what case agents suspect to be kilogram quantities of controlled substances from Mexico.

According to intercepted calls, the parties planned for an individual identified as

"Paisano" or "Paisano's son," to transport controlled substances to or near the area of

Illinois. Case agents believe that FOAD began communicating with Paisano or Paisano's

son over an unknown application (i.e., those communications were not intercepted). However, as demonstrated below, calls revealed that BEA owes FOAD a significant drug debt, and the controlled substances supplied by ARREDONDO-SANCHEZ to the ISAs is believed to be for BEA's distribution.

61. On February 1, 2025, at approximately 7:01 p.m., FOAD, using TARGET TELEPHONE 5, called ARREDONDO-SANCHEZ at 52-6624274721. ARREDONDO-SANCHEZ said, "Abu Neza [PH], I call, uh, Paisano and he told me he'll call me back." FOAD replied, "Okay, we talk this later on. I wanna tell you something. Listen...I wanna go to one black guy. He owe me some money. When I call you, I'm gonna ask you, what happen... you owe the people money. You say, 'Yeah, we owed those people money,' and you lost your brother, because of the money, Okay?" ARREDONDO-SANCHEZ acknowledged, "Okay." FOAD continued, "Just when I tell you, what happen with your brother because of the money. You say, I lost it, because of you Fred (FOAD), because I'm your co-signer... Because, the guy, he owe me about two hundred thousand. I just wanna just...I'm gonna go see him. When I be there I'm gonna call you. You say, 'Please, this time no fuck up with me, please,' okay?" ARREDONDO-SANCHEZ, repeated, "Okay, please, don't fuck up with me, fuck up with me this time." FOAD said, "Yeah, yeah, tell me this time, please. I'm go co-signer for you, no fuck up for me, please." ARREDONDO-SANCHEZ verified, "I will co-signer for you, okay, okay. The conversation continued and FOAD stated, "If he asks you what happen with your brother? You lost your brother, because...why? It's about the money, okay?" ARREDONDO-SANCHEZ replied, "You know what, Abu Neza [PH], what you just

28

telling me to say to you, it happened to me in the real life. You know my brother, my oldest brother, they killed him in my town, because of the money from the brother." FOAD said, "Yeah, I know, I know. Just this guy, he owe me money. I wanna, I wanna just show him what happened, you know." ARREDONDO-SANCHEZ agreed, "Okay, okay. I'll tell him, I lost my brother." FOAD reiterated, "Okay, when I'm go call you just respond. I'm go tell you, what happened with your brother. You say, I lost him, because, I'm your co-signer and you owe all the people money, okay?" ARREDONDO-SANCHEZ agreed.

62. Based on previously intercepted calls, I believe that ARREDONDO-SANCHEZ still intends to have "PAISANO"/"PAISANO's son" deliver kilogram quantities of narcotics to FOAD, and ARREDONDO-SANCHEZ told FOAD he was waiting for "PAISANO" to call him back to further discuss the transaction. FOAD dismissed this and wanted to talk to ARREDONDO-SANCHEZ about meeting with a person I believe to be BEA, who allegedly owed FOAD money. ("I wanna go to one black guy. He owe me some money".) Case agents observed during the time of this phone call that FOAD was traveling northbound into Wisconsin. I believe that FOAD advised that he would again call ARREDONDO-SANCHEZ once he met with BEA and prepared ARREDONDO-SANCHEZ to tell BEA about what happened to ARREDONDO-SANCHEZ's brother when FOAD and ARREDONDO-SANCHEZ owed people money. ("When I call you, I'm gonna ask you, what happen... you owe the people money. You say, 'Yeah, we owed those people money,' and you lost your brother, because of the money, Okay?" / "…You say, 'I lost it, because of you Fred, because I'm your co-

29

signer…'") ARREDONDO-SANCHEZ told FOAD that his brother was indeed killed because of money the brother owed, which I believe was a drug debt. ("You know my brother, my oldest brother, they killed him in my town, because of the money from the brother"). I believe that FOAD was aware of ARREDONO-SANCHEZ's brother being killed, but reiterated that BEA owed FOAD money. ("Yeah, I know, I know. Just this guy, he owe me money"). I believe that ARREDONDO-SANCHEZ's brother's death had no relation to the ISAs or BEA. Rather, I believe FOAD wants to encourage BEA to pay his drug debt and wanted BEA to know that if BEA did not repay his drug debt with FOAD and ARREDONDO-SANCHEZ, ARREDONDO-SANCHEZ's suppliers could commit acts of violence against them.

63.     On February 1, 2025, at approximately 7:23 p.m., FOAD, using TARGET TELEPHONE 5, called ARREDONDO-SANCHEZ, using 52-6624274721. When the phones connected, a male voice believed to be BEA could be heard talking to FOAD. ARREDONDO-SANCHEZ stated, "Hello." FOAD stated, "Yeah, Sanche [PH]." ARREDONDO-SANCHEZ asked "What [U/I] with you? Hey, what happened?" FOAD stated, "Listen." ARREDONDO-SANCHEZ replied, "Huh." FOAD stated, "I'm by the guy. Just tell him when I'm gonna receive the stuff." ARREDONDO-SANCHEZ stated, "Oh, okay. Where the guy at? Is he with you now?" FOAD answered, "He's next to me. He's listening." ARREDONDO-SANCHEZ replied, "Okay, listen, listen, my brother, I lost him. He passed away. He's the oldest of the family..." FOAD is also heard speaking to BEA on the side, stating: "he lost his brother, because of those people. He's the co-signer. He lost his brother [audio glitch]. He [U/I] 150. He was the co-signer for me. Now,

30

he doing just the stuff again for me." Bea stated, "Yeah." FOAD continued, "It's for me" ARREDONDO-SANCHEZ stated, "...and, and I don't know what's gonna happen. When we gonna get this done. Don't, don't, don't fuck with me; don't fuck with me like that, you know." FOAD stated, "Listen, listen." ARREDONDO-SANCHEZ replied, "Huh." FOAD asked, "When we get the new..." ARREDONDO-SANCHEZ stated, "Tell me." FOAD asked, "...stuff. When we get..., the new one, when we get it?" ARREDONDO-SANCHEZ stated, "Maybe, uh, maybe a week. I don't know, uh, we'll see what happen Monday." FOAD stated, "Please Sanche [PH], we need it bad, man." ARREDONDO-SANCHEZ replied, "Okay, okay, uh, okay." FOAD stated, "Tell him..., listen, tell him to drop whatever four (4), five (5), six (6), seven (7). This time guaranteed, man. No problem." ARREDONDO-SANCHEZ replied, "Oh, okay. Don't, don't screw up anymore, you know." FOAD stated, "Please, no, no, no. Don't worry about it." ARREDONDO-SANCHEZ stated, "We keep in touch. We keep in touch." FOAD stated, "We go cover it in the future. No worry about it. We'll cover it." BEA stated, "Yeah, for sure." ARREDONDO-SANCHEZ replied, "Okay, okay, okay." FOAD informed ARREDONDO-SANCHEZ, "The guy is listening. You know, we go cover it." BEA said, "Yeah, that's for sure, for sure." ARREDONDO-SANCHEZ replied, "Alright, okay, good." FOAD stated, "Just tell..., tell him to drop whatever, five (5), six (6), seven (7). We go take it; no problem." ARREDONDO-SANCHEZ stated, "Okay, alright, okay, okay." FOAD, "Okay?" ARREDONDO-SANCHEZ, "Okay, brother." FOAD confirmed, "Okay, alright." ARREDONDO-SANCHEZ stated, "Okay brother. Let's keep in touch; keep in touch." FOAD stated, "Okay, alright." ARREDONDO-SANCHEZ stated, "Alright, bye."

31

64.     At approximately 7:21 p.m., FOAD arrived at SUBJECT PREMISES 2 (BEA's residence) and proceeded to be let inside as observed on electronic surveillance. After FOAD was already inside SUBJECT PREMISES 2, case agents set up physical surveillance on SUBJECT PREMISES 2. In the phone call, BEA can be heard speaking with FOAD in the background. I am able to recognize BEA's voice based on my review of numerous prior intercepted voice calls over TARGET TELEPHONE 1 and TARGET TELEPHONE 3. As discussed in FOAD and ARREDONDO-SANCHEZ's conversation at 7:01 p.m., ARREDONDO-SANCHEZ began speaking about his brother getting killed due to a drug debt. FOAD told ARREDONDO-SANCHEZ that he was by BEA and asked ARREDONDO-SANCHEZ to tell BEA when they were going to get what I believe to be the kilograms of "old man" or heroin. ("I'm by the guy. Just tell him when I'm gonna receive the stuff."). FOAD informed BEA on the side that ARREDONDO-SANCHEZ is his co-signer, which I know based on training and experience means someone who is also liable if a drug debt does not get paid. In front of BEA, FOAD begins to again push ARREDONDO-SANCHEZ to get the kilograms of heroin to FOAD so he could further distribute them to BEA. ("Tell him..., listen, tell him to drop whatever four (4), five (5), six (6), seven (7). This time guaranteed, man. No problem.") ARREDONDO-SANCHEZ informed FOAD they would stay in touch. I believe that FOAD drove to Wisconsin to simultaneously meet with BEA and call ARREDONDO-SANCHEZ to (1) ensure BEA that he (FOAD) has been in contact with a source of supply of narcotics for BEA; and (2) instill fear into BEA to pay his current and future drug debts.

32

**D. Seizure of Suspected Fentanyl on April 17, 2025 During Traffic Stop and Seizure of the Subject Devices**

65. During the evening hours of April 17, 2025, case agents observed that the location data for FOAD's TARGET TELEPHONE 4 began traveling north towards Wisconsin. Shortly thereafter, location information for BEA's TARGET TELEPHONE 3 reflected it left SUBJECT PREMISES 2 and began traveling south, leading case agents to believe the two would imminently be meeting. According to electronic surveillance, case agents knew that BEA was driving his black Cadillac Escalade. FOAD's phone subsequently began to reflect it was in the area of Pleasant Prairie, Wisconsin, nearing the outlet mall. Case agents then stopped receiving location data for BEA's phone. However, as officers were traveling south, they observed BEA's Cadillac Escalade traveling back north. Officers then began surveilling BEA.

66. Subsequently, law enforcement officers conducted a traffic stop of the Cadillac Escalade and identified the driver as BEA and the front passenger as Crystal ROBINSON. A drug detection dog was on the scene of the traffic stop, and when it circled the Cadillac Escalade, the drug detection dog alerted to the presence of controlled substances in/on the Cadillac Escalade. Subsequently, officers conducted an on-scene search of the Cadillac Escalade and located a brick-shaped object under the hood. The suspected controlled substance was field tested, which test returned positive for the presence of fentanyl, a Schedule II controlled substance.

67. In addition, law enforcement conducted a search incident to arrest of BEA and recovered a cellular telephone from BEA's person: **SUBJECT TELEPHONE 1**. A

33

search of ROBINSON incident to her arrest led to the recovery of two cellular telephones from her person **SUBJECT TELEPHONE 2** and **SUBJECT TELEPHONE 3**. A search of the vehicle incident to the arrest of BEA led to the recovery of **SUBJECT TELEPHONE 4** from a cup holder in the vehicle's center console and an iPad Pro from the front passenger seat. At this time, case agents are not seeking a warrant to search the iPad Pro recovered from the vehicle. Officers read BEA his *Miranda* rights, and BEA advised that he wanted to confer with a lawyer.

68. Officers conducted a *Mirandized* interview of Crystal ROBINSON. ROBINSON admitted that she travelled with Bea to the Kenosha area, where they obtained food at McDonalds. ROBINSON denied meeting with anyone in the Kenosha area and maintained, in sum, that ROBINSON and BEA traveled from Milwaukee to the Kenosha area because that particular McDonalds had the best food. Based on my training and experience, knowledge of this investigation, and phone location data, I believe that FOAD and BEA met in the Kenosha area, where BEA obtained the kilogram of fentanyl later located in his engine compartment from FOAD. I further believe that ROBINSON was present in the vehicle at the time of this meeting. Based on my training and experience, I also know that it is common for drug traffickers involved in the transportation of large amounts of drugs to enlist a passenger to ride with them to and from the transaction because drug traffickers believe that law enforcement will be less suspicious of a couple than a single male travelling alone. Based on this, I believe that ROBINSON was aware of the purpose of this trip to Kenosha (to obtain drugs) and that her involvement was purposefully designed to reduce the chance that BEA would be

34

stopped or suspected of a crime by police. I believe that searching the two devices recovered from ROBINSON's possession (**SUBJECT TELEPHONE 2** and **SUBJECT TELEPHONE 3**) will provide evidence of her knowing participation and help define the scope of her involvement in BEA's DTO.

### Execution of Federal Search Warrants on April 17, 2025

69. On April 18, 2025, federal search warrants were executed at Bar 1000 and Bea's residence. A search of I-Care Childcare/Bar 1000 resulted in the recovery of the following: approximately 5,375 grams (5 kilograms) of suspected fentanyl, approximately 1,055 grams (approximately 1 kilogram) of suspected cocaine. All narcotics were field tested and indicated positive results for their respective controlled substance. All narcotics were weighed while in the respective packaging. Additionally located were 3 firearms including a shotgun and 2 pistols, one with a switch, which converts the firearm from semi-automatic to a fully-automatic. Law enforcement officers also located an envelope addressed to BEA at the address of ICare Childcare/Bar 1000.

70. A search of BEA's house resulted in the recovery of the following: 2 kilogram presses, a money counter, 10 firearms, including 5 pistols and 5 rifles, and ammunition. Numerous firearms were located in a bedroom identified by his mother as belonging to BEA, and an additional firearm was located in a vehicle believed to be used by BEA. Furthermore, located within the residence were multiple documents for "Bar

1000"/39xx N. Teutonia Avenue, and mail addressed to BEA at the address for ICare Childcare/Bar 1000.

71.     Based on the foregoing, case agents believe there is probable cause to believe that the **SUBJECT DEVICES** are likely to contain evidence of BEA's and ROBINSON's drug trafficking activities. I know that the **SUBJECT DEVICES** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **SUBJECT DEVICES** first came into the possession of DEA/case agents.

## TECHNICAL TERMS

72.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a

36

computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and

presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

73. Based on my training, experience, and research, I know that the **SUBJECT DEVICES** have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

74. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

75. There is probable cause to believe that things that were once stored on the **SUBJECT DEVICES** may still be stored there, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

76.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **SUBJECT DEVICES** were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT DEVICES** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

40

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

77. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **SUBJECT DEVICES** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

78. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night. There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

## CONCLUSION

79. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **SUBJECT DEVICES** described in Attachment A to seek the items described in Attachment B.

80. This is part of an ongoing investigation into a multi-state DTO distributing fentanyl, cocaine, and other controlled substances in the southeast Wisconsin area. This investigation hopes to identify all of the local members, any out of state members, any

41

out of country members, and the sources of supply of the controlled substances being brought into southeast Wisconsin. The investigation will continue until all appropriate law-enforcement investigative methods have been exhausted.

42

## ATTACHMENT A

The properties to be searched are described as:

a.  a white/gold iPhone with a cracked back, identified as "**SUBJECT TELEPHONE 1**,"

b.  a pink/gold iPhone, identified as "**SUBJECT TELEPHONE 2**,"

c.  a white/gold iPhone in a pink case, identified as "**SUBJECT TELEPHONE 3**," and

d.  a black iPhone, identified as **"SUBJECT TELEPHONE 4**."

**SUBJECT TELEPHONES 1, 2, 3, and 4,** collectively the **"SUBJECT DEVICES"** are currently located at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin.  This warrant authorizes the forensic examination of the **SUBJECT DEVICES** for the purpose of identifying the electronically stored information described in Attachment B.

43

## ATTACHMENT B

1.      All records on the **SUBJECT DEVICES,** as described in Attachment A, that relate to Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A); Conspiracy to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846; Possession of a Firearm in Furtherance of Drug Trafficking and Possession of a Machine Gun in Furtherance of Drug Trafficking, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii); and Possession of a Machine Gun, in violation of Title 18, United States Code, Sections 922(o) and 924(a)(2) and involve Timothy BEA and/or Crystal ROBINSON since January 2022, including, but not limited to:

    a.  Contact lists;

    b.  lists of customers and related identifying information;

    c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    d.  any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

    e.  any information recording schedule or travel;

    f.  all bank records, checks, credit card bills, account information, and other financial records;

    g.  Photographs and/or video depicting possession of drugs, firearms, assets, or other activities related to drug trafficking

44

h.  Any evidence related to either the ownership, purchase, or possession of drugs or firearms;

i.  Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

j.  All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **SUBJECT DEVICES**;

2.  Evidence of user attribution showing who used or owned the **SUBJECT DEVICES** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.